Okay, our next case is United States v. Beard, No. 257031. Exemply, I said you were excused earlier. I didn't realize. I apologize for that, and you are now unexcused. All right. Counsel, you may proceed. May it please the Court, I'm Neal Van Dalsom. I'm here for the appellant Stephen Beard. Briefly at the beginning, Your Honor, I would like to address the hearsay issue, which was argument B in our opening brief. The government concedes that Exhibit 86, which has been characterized as a letter, but really isn't, was hearsay. And at trial, the government used that letter to establish the date that Mr. Beard became a member of Indian tribe. The government's response is, well, Exhibit 85 eliminates any harm from that. And in preparing for oral argument, I studied Exhibit 85, and I want to just point out some characteristics of Exhibit 85. Page 1 is a CDIB record from the Bureau of Indian Affairs. All that really addresses is blood quantum. It doesn't – it does not address the question of tribal recognition by the Cherokee Nation. Pages 2 and 3 are some sort of a printout. It's unclear exactly what that is. We know, though, if you read the content of it, that it was printed in 2024, which is after the events that give rise to this case, because it says that Mr. Beard's 51 years old and lists his date of birth. It also doesn't list any information that indicates a date of tribal membership. And the fourth page also doesn't have any documents that address tribal membership, and it includes a personal ID that was issued by the state of Oklahoma that doesn't expire until June 30th after the events of this case. So none of those documents in any way have the effect that the government claims of providing the jury with a basis to find beyond a reasonable doubt that tribal membership existed at the time of the alleged offense. Having said that, I would like to discuss the sufficiency of the evidence and prosecutorial misconduct arguments. On that issue about Exhibit 85, what about the testimony of the FBI special agent, Kirk? Could the government rely on that testimony to support their position on Indian staff? There's nothing in the record as I read it that establishes when, and that is our contention. There is evidence that he's an Indian at the time of trial. What's lacking is evidence that he was an Indian when this happened. I'm really confused about that argument. My impression was that you're either Indian or you're not, and that may be confirmed at particular times and places, but it doesn't affect a status that you are or are not. So I don't understand what you've just said. You're suggesting that at one point he was not an Indian, and then when it got confirmed, kind of like quantum mechanics, all of a sudden it flops into reality, which didn't exist before? I just don't understand what you're saying. I would rely on Hatley. This Court's decision in Hatley makes clear that Indian status is not based just on your genealogy. It is a political association. Antelope also indicates that. Indian status is not racial. You can be racially eligible to be a member of a tribe, but elect not to be one, or the tribe doesn't accept you as a member. And so it matters what your political affiliation was as of the date of the offense is the issue. If there's no further questions on that topic, I'll move to the sufficiency of the evidence in prosecutorial misconduct. And I'd like to talk about the facts of the case. And I understand that we're not here to retry the case, but the strength of the evidence is important both to the sufficiency of the evidence and to the issue of prosecutorial misconduct. Because for prosecutorial misconduct, as this Court noted in the Arrieta-Agrassat case, the Court has to consider how strong was this case when we're evaluating whether this improper conduct by the prosecutor matters. So it's all one big issue. Was this a strong case? Was it a weak case? Is it a sufficient evidence case? I would ask the Court to think about the role of imperfect self-defense. That was a defense in this case. To find Mr. Beard guilty, the jury had to find beyond a reasonable doubt that he did not act in imperfect self-defense. He acted in imperfect self-defense if he subjectively acted out of fear that he was in danger of imminent serious bodily injury. So to prevail, the government had to present evidence to establish beyond a reasonable doubt that that's not why he acted. But just to be clear, on appeal, it's whether any reasonable jury could find. Correct.  And on that point, I would refer you to Goldsberry, which we've cited, that has a fairly structured approach to how to answer that question. And it points out that it's not sufficient for this Court to say, well, we can make up some wild theory that supports the jury's verdict. It is more, does this evidence taken together make sense? Does the verdict make any sense? Is there a way it makes sense? The government's, first of all, the evidence of what actually happened is that there was a history of violence perpetrated by Mr. Ingram against Mr. Beard. We've outlined that in the brief. All these incidents, the ghillie suit incident, the brass knuckles incident, all of these things where Mr. Ingram directed violence toward Mr. Beard. There was ample evidence that Mr. Ingram carried a gun and that Mr. Beard knew that. Four different witnesses testified, yeah, it was his normal thing to have a gun. As far as I know, he always had a gun. But when he was shot, he wasn't pulling out a gun or threatening Beard, is that right? That's correct. He was too busy invading Mr. Beard's home. This shooting happened during what can only be described as a home invasion. Ms. Meigs was jamming something to pry the door, and Mr. Ingram was pulling with all of his might and ripped the door off. Tell me if you think these facts are supported by the record. That Mr. Beard told, I can't remember what her name is, his girlfriend for lack of a better term, that she needed to come get her stuff and that he was going to be gone from his house. On one of those, I'm going somewhere other than home, that is supported by the record. On the other, I think it's disputed what was said. Whether it's disputed or whether it's supported by the record is another thing. I mean, disputed testimony can still support that fact. The question is, was this a trap? Did Mr. Beard say those things? Hold it. You're getting ahead of me. Are we in agreement on those two facts that those could be supported, but there's record evidence that supports those two statements? There's evidence that Mr. Beard said, get your stuff. And Mr. Beard says, I was talking about the stuff in my truck, the Walmart bag. Okay, that's just disputed testimony again. His statement can be heard either way. I mean, he made the statement. Later, maybe he clarified it. Maybe he said, I meant the stuff in the truck. But that's one of his exact words. Do you agree with that? At least there's some evidence those weren't his exact words. Get your stuff. I'm not going to be home. Something to that effect. I'm going not home. I'm going to somebody else's house. Okay, so that sort of suggests I'm not going to be home, right? Right. Okay. Didn't park at his normal spot. Actually, the evidence is that his car broke down in the field, and there's no evidence to the contrary. Was his car in its normal spot? It was not. Okay, so that's supported by the record, that his car was not in the normal spot. Correct. Okay. There was testimony that you had to pry the door open with a screwdriver to get in because the lock was messed up. Is that true? That is not what the record shows. Ms. Meeks testified that he would put a chain on it and that she could open that using a pry bar. Okay. All right, go ahead. The issue on the trap is, does the evidence establish that he set a trap? Was it his plan? Clearly, you can't set a trap, bring somebody someplace, make it appear that you're being attacked to shoot them. That's not imperfect self-defense. The problem is, is the record as a whole doesn't support that at any level. Globally, it doesn't. They didn't think they were being invited over. They parked at the neighbor's. They went across the field to get to the house. They couldn't see his truck only because they parked at the neighbor's top. He couldn't have foreseen that. He locked his front door. If he's trying to get them to come over to have a confrontation, why would he do that? There's so many problems with the theory that it shouldn't be accepted beyond a reasonable doubt. I have three minutes left. May I reserve that time?  Thank you. May it please the Court. My name is Linda Epperle. I represent the United States in this case. Due to the number of allegations of error and the Court's apparent familiarity with the facts of this case, I'd just like to address quickly a couple of things that were raised in your questions with opposing counsel. First, we'd like to point out that there may have been testimony that the victim owned a gun. I think he oftentimes wore camo. He had that kind of thing. But there was no testimony that the victim ever brandished or pointed a firearm at the defendant. Granted, these two 50-year-old men fighting over the 20-year-old woman, both engaged in some pretty questionable behavior back and forth. But while the defendant at times had pulled a gun before, there's no testimony the victim had ever brandished or pointed a gun at the defendant. Secondly, we would disagree that this was unquestionably a home invasion, for all the reasons cited in the questions that Judge Carson just asked. Nobody agreed with me, so I don't even know that I was right. It tracked with what I'm aware of from the record. I was not trial counsel, but in reviewing it, it seemed to me that there was certainly proof that he told them he was irritated with Ashton. Ashton told her to go get her stuff. Told her he was going somewhere else. And he may have later decided that, no, he meant his truck. Well, that really doesn't make any sense, since the truck was going with him, leaving the girl there with no ride other than to ride with the victim. I believe that the testimony was that they had frequently used whatever tool it was they picked up, a screwdriver or some sort of wedge, to open that door because the lock messed up. That shouldn't have been a surprise. Let me ask you this. To your knowledge, was there testimony in the record that the lock didn't work and that if you wanted to get in the house, you basically had to pry it open? I think there was testimony that sometimes it worked, sometimes not. In this case, I think there was testimony that this was one of those times it did not work. I believe there's somewhere else, and it may have been in her testimony. I don't remember if it's direct or cross, where she indicated she didn't have her key. But I think there is evidence, and I unfortunately cannot give you a citation, that this was something they did. I mean, when they got up to the door and it was locked and they couldn't get it open, they didn't have to go searching around this entire property to find the tool. It was right there because they used it frequently. As to the sufficiency of the evidence, granted that there was bad behavior on both sides here. There are, therefore, inferences that can be drawn on both sides here. But this is not a case like Goldsberry where there were two competing inferences that were plain and clear and couldn't both be true. In that case, either the father sexually molested his daughter in bed knowing what he was doing, or the daughter who came into the bed in the night was mistaken by that father for his wife because they were basically the same size. So either it was an accident or it was not. There was no proof that could give the jury any assistance really in deciding which of those was true. And under that case, the court decided that that put it all in equipose, and the court went from there. Here, we don't have that situation. Yes, there are different inferences, but they're not one or the other as clear cut as they were in that case. Here, there were inferences that were logical, that were within, I believe the court refers to it as probabilic reasoning, something to that nature. Those inferences here supported guilt and supported it clearly enough that it removes it from the situation in Goldsberry. It was more like the situation, I think it was in the Smith case, where there were different inferences, but there was an ability to make a decision between them and make a reasoned decision. Finally, as to the bad acts that were mentioned, we'd ask the court to pay particular attention to the 23-page order that the magistrate judge entered in deciding all the types of other crimes evidence that could come in or other bad acts and what was not allowed. We believe that the court struck a reasoned result in looking at all of the history of this situation that truly the jury needed to hear in order to understand what had happened. The inference and the pattern toward guilt laid out by the government was supported by the evidence and supported here by people outside these three people. There were neighbors, there were other friends, there was the man who actually owned the shotgun, who had loaned it to another friend that testified that the defendant had borrowed it from him that day or the day before. There's certainly evidence to support this verdict, evidence that was sufficient, and while there was strong arguments made in the closing argument here, they did not amount to prosecutorial misconduct. We believe that the sentence was not unreasonable after the government moved to dismiss one of those counts, and for those reasons, unless there are further questions, we'd ask the court to affirm. Counsel, could I ask you, what was the evidence that Mr. Beard was an Indian at the time of the offense? Because you've conceded that Exhibit 86 is out, right? Was that the letter from the tribal registrar? Yes, but 85 is in, so tell me why you've got enough. Here's why I believe that we have enough. The Hatley case, Your Honor, in addition to establishing that we needed to prove Indian status at the time of the offense, and that case was just decided last September, so after this trial, and that had not been how I think any of the litigants usually viewed that question. In that case, the court said a letter from the tribe, from a registrar, is not going to be sufficient. Under the hearsay rules, it's created for litigation and things of that nature. But the court went on to say, here are the things that you could use. The court explained that the court could look to CDIB cards, which are self-authenticating that may be admitted without additional evidence, that we could look to tribal documents containing that information, like a registration card or a document bearing a tribal seal rather than a federal one. Here, it's my understanding that the court had before it the CDIB determination by the Bureau of Indian Affairs, the defendant's own testimony that he was an Indian, his tribal ID card, evidence from the Cherokee Nation's database, which is how they keep their records, of defendant's citizenship and citizenship number. But was the tribal ID card part of Exhibit 85? I cannot tell you whether it's part of Exhibit 85. I can tell you that I believe it was introduced. I know that the Cherokees do such a card. I'm looking at the CDIB, a Social Security card and driver's license, but I'm not finding the tribal ID card. Go ahead. I may be mistaken, but I believe that it was introduced, and I'll confess that I'm relying mainly on my memory of the brief here as opposed to that exhibit. At any rate, even if it was not there, I believe that the testimony here was sufficient to prove that he was an Indian and would be sufficient to meet that test. As to what should be involved in the test and whether there should be proof of tribal registration in addition to that individual defendant's Indian status, et cetera, we would ask this Court to take notice that there were two cases where, I think one from our office and one from the Northern District, where we are asking this Court to take a second look at the Prentiss case. And I believe that the Public Defender's Office filed responses on both of those yesterday. I haven't had time to look at it. Well, but that had to do with proving non-Indian status, and here we're proving Indian status, and so we need the blood element and the recognition element, correct?  And while it is 1152 versus 1153, many of those considerations may impact what the Court does here if the Court believes that there's a question about those documents. If there's nothing further, we'd ask the Court to affirm. Thank you, Counsel. Rebuttal? Your Honors, I would ask you to really look at Exhibits 194 and Exhibit 155, and you can also look at Defendants Exhibit 3, which is just an aerial photo. This is a rare case where everything that happened is on video. And what you will see in those is two people who clearly are not invited parking at an adjacent property, going across a field, and ripping off the front door of my client's house. If the idea is that's how people usually got into the house, then you had to have two people to get into the house that way. This was a home invasion. They did not think they were invited over to do what they did. On the location of the truck, the question is, did he hide the truck? And the evidence is the truck would have been visible had they used the driveway. Look at Government Exhibits 36 and 46. You can see in the background the front of the trailer. So anybody who pulled in front of the trailer could see the truck if they had their headlights on. We have a complicated theory that ultimately isn't supported by the evidence and doesn't make sense for this trap notion. There were two shotgun shots, is that right?  Even if it were a home invasion, do you think it supports, certainly do you think it supports the second shot, but even the first one? They were outside, it wasn't while they were in the house, right? The door ripped open and then the shooting occurred. Yeah, but shooting when the victim was outside. Yes. The second shot, the evidence is not established caused a death, is another problem. The medical examiner said, I don't know, I can't say he was alive, but probably alive when the second shot happened. So that's an additional problem. If it's just that act, did it cause a death? The jury can't find that. And I'm out of time. Thank you counsel. Thank you. Case is submitted. Counsel are excused. Thank you for the arguments.